8          UNITED STATES DISTRICT COURT

9         CENTRAL DISTRICT OF CALIFORNIA

10

11   KENNETH POPOVICH,                    Case No.  CV 15-09791 AB (MRWx)

                    Plaintiff,            **FINDINGS OF FACT AND
12                                        CONCLUSIONS OF LAW
                                          FOLLOWING BENCH TRIAL**
13   v.

14   METROPOLITAN LIFE
     INSURANCE COMPANY; DATA
15   ANALYSIS, INC. EMPLOYEE
     BENEFIT PLAN; and DOES 1 through
16   10, inclusive,

17                    Defendants.

18

19

20          In this case under the Employee Retirement Income Security Act of 1974

21   ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, Plaintiff Kenneth Popovich ("Plaintiff") alleges

22   that Defendants Metropolitan Life Insurance Company ("MetLife") and Data Analysis,

23   Inc. Employee Benefit Plan improperly denied his long term disability benefits.  Plaintiff

24   contends that MetLife's medical analysis was flawed and failed to consider the mental

25   stress inherent in his occupation.  Plaintiff seeks an order requiring MetLife to pay

26   benefits.

27          The parties submitted their opening and responsive trial briefs, along with the

28

administrative record and supplemental evidentiary materials. The Court held oral argument on May 16, 2017. The Court rules as follows.

## I. SUMMARY OF DISPUTE

This case presents two issues: (1) whether Plaintiff's heart condition prevents him from working at a mentally stressful occupation; and (2) whether Plaintiff's occupation as an assistant news editor is mentally stressful. The parties do not dispute that Plaintiff suffers from a heart condition stemming from a heart attack in 2012.

However, MetLife determined that Plaintiff's heart condition was not so severe as to prevent him from working a sedentary job. MetLife relied on the report created by its independent physician consultant ("IPC") and determined that Plaintiff's symptoms— chest pains, shortness of breath, and lack of concentration—did not evidence a disabling heart condition. According, MetLife denied long term disability ("LTD") benefits. Plaintiff argues that his heart condition caused symptoms even without physical exertion and made it impossible to perform his high-stress occupation as an assistant news editor.

Most of the doctors' reports in the Administrative Record take a clear position with regards to Plaintiff's disability claim. MetLife's physicians, for example, all state that Plaintiff is not disabled. Plaintiff's cardiac electrophysiologist states that Plaintiff cannot do physically or mentally stressful work, while his primary care physician takes no position. The parties dispute, however, whether Plaintiff's primary cardiologist believes Plaintiff is able to work in his usual occupation. In sum, the record contains conflicting evidence that can support a determination either way.

However, after carefully considering all of the evidence, the Court finds that Plaintiff has demonstrated that his heart condition caused him to be totally disabled from his usual occupation and that MetLife should not have denied him LTD benefits.

## II. LEGAL STANDARD

In the Ninth Circuit, actions to recover benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA") are adjudicated by a bench trial under the Federal Rule of Civil Procedure Rule 52(a). *Kearney v. Standard*

*Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999). Under Rule 52(a), the court can resolve factual issues in favor of either party, and it must "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a).

In a previous Order, the Court granted the parties' stipulation that the standard of review in this case is *de novo*. *See* Stipulation (Dkt. No. 28); Order Granting Stipulation (Dkt. No. 30). Under the *de novo* standard, the Court independently considers the evidence, finds facts, and determines how the policy applies, just as it would resolve any other breach of contract claim. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112-13 (1989); *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009) ("'de novo review' is a misleading phrase . . . For what *Firestone* requires is not 'review' of any kind; it is an independent decision rather than 'review' that *Firestone* contemplates . . . [The] court takes evidence (if there is a dispute about a material fact) and makes an independent decision about how the language of the contract applies to those facts.").

"In a trial on the record, the court 'can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.'" *Armani v. Nw. Mut. Life Ins. Co.*, 2014 WL 7792524, at *8 (*quoting Kearney*, 175 F.3d at 1095); *see also Schramm v. CNA Fin. Corp. Insured Group Benefits Program*, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010) (a court reviewing the administrative record "evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate").

The court may consider the administrative record, which are the materials the administrator considered in reaching its benefit determination, and "new evidence may be considered under certain circumstances to enable the full exercise of informed and independent judgment." *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943 (9th Cir. 1995).

Plaintiff bears the burden of proof of showing, by a preponderance of the evidence, that he is entitled to the benefits provided by the policy except with regards to

1  matters within the defendants' control.  *Estate of Barton v. ADT Sec. Servs. Pension*
2  *Plan*, 820 F.3d 1060, 1066-65 (9th Cir. 2016).

3  **III.  EVIDENCE BEFORE THE COURT**

4      The Court considered the evidence in the Administrative Record ("AR").

5      Plaintiff also submitted two letters outside of the administrative record as extrinsic
6  evidence.  *See* Mot. in Limine, Dkt. No. 42.  One letter is from Dr. Ilan Kedan,
7  Plaintiff's cardiologist, to the Social Security Administration ("SSA") in support of
8  Plaintiff's application for Social Security disability benefits.  *See* Dkt. No. 42-1, Ex. A
9  ("Kedan Letter to SSA").  The other letter is from the SSA, granting Plaintiff disability
10  benefits.  *See* Dkt. No. 42-1, Ex. B ("SSA Letter").

11      Materials outside of the administrative record can be considered "only when
12  circumstances clearly establish that additional evidence is necessary to conduct an
13  adequate de novo review of the benefit decision."  *Mongeluzo*, 46 F.3d at 944 (quotation
14  marks and citation omitted).  These circumstances include claims where: (1)
15  "consideration of complex medical questions or issues regarding the credibility of
16  medical experts" is necessary; (2) there was "limited administrative review procedures
17  with little or no evidentiary record"; (3) "interpretation of the terms of the plan rather
18  than specific historical facts" are warranted; (4) "the court is concerned about
19  impartiality"; (5) the claims "would have been insurance contract claims prior to
20  ERISA"; and (6) "there is additional evidence that the claimant could not have presented
21  in the administrative process.  *Opeta v. Nw. Airlines Pension Plan*, 484 F.3d 1211, 1217
22  (9th Cir. 2007) (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1027
23  (4th Cir. 1993)).

24      Here, Dr. Kedan's letter to the SSA satisfies the first *Opeta* factor.  One of the
25  key disputes in this case is the "credibility of medical experts," specifically Dr. Kedan
26  and Dr. Michael Sassower, an IPC hired by MetLife.  According to MetLife, Dr. Kedan
27  told Dr. Sassower that "he could not see why [Plaintiff] could not work a desk job."
28  (AR 199.)  Plaintiff questions the credibility of this statement and insists that it is

inconsistent with Dr. Kedan's position throughout the claims process.  *See* Mot. in Limine at 5-6.  Dr. Kedan's letter weighs directly on the credibility issue.  Therefore, the Court will admit this letter.

However, the Court declines to admit the SSA Letter.  Although ERISA plan administrators have to consider a disability determination by the SSA (*see Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009)), the SSA had not made any determination when Plaintiff brought its disability claim before MetLife.  The letter also does not provide any additional medical evidence and does not satisfy any of the *Opeta* factors.  Therefore, the Court declines to admit the SSA letter and will not consider it at this time.

## IV.    FINDINGS OF FACT[1]

### A. The Plan's LTD Benefit

MetLife insures long term disability ("LTD") benefits under the Data Analysis, Inc. Employee Welfare Plan (the "Plan") established by Plaintiff's former employer, Data Analysis, Inc.  (AR 3, 54.)[2]  Plaintiff was covered by the Plan.

Under the Plan's LTD Coverage, a participant is entitled to full monthly disability benefits when they are "totally disabled."  (AR 33.)  The Plan defines "totally disabled" as being "unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue Your Usual Occupation in the usual and customary way . . . ."  (AR 25.)  "Substantial and Material Acts" are defined as:

> [T]he important tasks, functions and operations generally required by employers from those engaged in Your Usual Occupation that cannot be reasonably omitted or modified.  In determining what substantial and material acts are necessary . . . [MetLife] will first look at the specific

---

[1]  Any conclusion of law which is deemed a finding of fact is incorporated herein by reference.
[2]  Bates numbered citations are to the Administrative Record ("AR") filed under seal on March 27, 2017.  (Dkt. No. 39.)

duties required by Your job . . . then determine whether those duties are
customarily required by other employees engaged in Your Usual
Occupation. If any specific, material duties required of You by Your job
differ from the material duties customarily required of other employees
engaged in Your Usual Occupation, [those duties] will not [be]
consider[ed] . . . .

(AR 26.)

### B. Plaintiff's Employment History

Plaintiff worked as an assistant news editor for Investor's Business Daily from 2003 to November 2013. (AR 329.) In that position, Plaintiff regularly assigned and edited articles on corporate earnings and updated stock market news on the company's website. Plaintiff was required to assess corporate earnings by calculating quarterly changes in earnings. Because Investor's Business Daily strived to publish stories and analysis "within minutes of breaking news," Plaintiff faced significant deadline pressure. (AR 329, 449.)

The Department of Labor characterizes a news editor as a sedentary job. Specifically, its Dictionary of Occupational Titles ("DOT") states that a news editor plans the layout of a newspaper edition; confers with staff regarding the placement of developing news stories; determines placement of stories based on "relative significant, available space, and knowledge of layout principles"; approves proofs of future editions; writes or revise headlines; edit copy; and perform related editorial duties as required. (AR 588-89; *see also* Petti Decl., Ex. A, Dkt. No. 44-1.)

In an "Emplyee's Job Description" form filled out by Plaintiff's employer, Plaintiff's occupation requires 40 hours of work per week, 7 to 8 hours of work per day, and is sedentary. Stressful situations occur "occasionally" or 1-33% of the time, while interpersonal interactions occur "continually" or 67-100% of the time. Plaintiff's occupation requires little to no physical exertion and only requires the repetitive use of his hands. (AR 449.)

Consistent with advice from his doctors, Plaintiff stopped going to work on November 18, 2013. (AR 329, 409.)

### C. Plaintiff's Medical History Prior to Filing His LTD Claim

On March 26, 2012, Plaintiff suffered from a heart attack. (AR 388.) He was initially treated at Los Robles Hospital where he was found to have a 100% blockage of his left anterior descending artery ("LAD"). (AR 388, 428.) Stenting of his LAD was unsuccessful. (AR 288.) On March 27, 2012, Plaintiff had an echocardiogram, which showed an ejection fraction ("EF") of 35%.[3] (AR 388.)

On April 5, 2012, Plaintiff was admitted to Cedar-Sinai Medical Center for a triple coronary artery bypass graft ("CABG") surgery. (AR 428.) Plaintiff received a bypass graft from his LIMA to LAD artery ("LIMA graft"), radial to ramus arteries ("Radial graft"), and RIMA to OM1 artery ("RIMA graft"). (AR 428-29.) Following the surgery, on April 8, 2012, Plaintiff had another echocardiogram, showing Plaintiff's EF at 42%. (AR 388.)

Plaintiff stayed on medical leave from March 27, 2012 to August 13, 2012. (AR 444.) After returning to work, Plaintiff continued to suffer from poor heart health with an EF of 30-35% in January 2013. (AR 313) On March 19, 2013, Plaintiff had an implantable cardioverter defibrillator ("ICD") inserted following the recommendation of his cardiac electrophysiologist, Dr. Donna Gallik. (AR 311, 313.)

On July 18, 2013, Plaintiff again went on medical leave.[4] He resumed part-time work on September 3, 2013 and full-time work on September 23, 2013. (AR 444.) On November 15, 2013, Plaintiff was unable to complete his regular shift. November 15, 2013 was Plaintiff's last day at work. (AR 329.)

On November 19, 2013, Plaintiff consulted with Dr. Kedan, who indicated that Plaintiff suffered from a great deal of stress, neck pain, lightning shock chest pains, shortness of breath, and panic attacks. Dr. Kedan also noted that Plaintiff was clinically

---

[3] An EF of 50% to 70% is considered normal. *See* Kedan Letter to SSA at 1.
[4] The AR does not explain why Plaintiff went on medical leave a second time.

stable and on a good medical regimen.  (AR 382-84.)

On January 31, 2014, Plaintiff met with Dr. David Austin, his primary care physician, who recommended injections to treat his cervical spine pain.  Dr. Austin also noted a wide array of illnesses and related symptoms, including coronary artery disease, ischemic cardiomyopathy, pneumothorax, coronary artery bypass graft, anemia, systolic chronic heart failure, coagulopathy, euthyroid sick syndrome, hypertension, anxiety, depression, dyslipidemia, cardiomyopathy, and chest pain.  Plaintiff reported taking Xanax, Lipitor, Coreg, Cymbalta, an anti-inflammatory, a diuretic, Norco, Prinivil, Paxil, and Ambien to treat those symptoms.  (AR 440-41.)

On March 3, 2014, Plaintiff had a follow-up with Dr. Gallik about his ICD.  Dr. Gallik noted that Plaintiff had "external chest discomfort" after walking about half a block and suffered from dyspnea, or shortness of breath, even while sitting.  (AR 304.) Dr. Gallik recommended further testing to evaluate the extent of Plaintiff's ischemia. (AR 305.)

On April 10, 2014, Plaintiff underwent a Regadenoson Stress Electrocardiography and a Regadesoson Myocardial Perfusion SPECT test ("SPECT").  The stress electrocardiography revealed "an incomplete left bundle branch block and nonspecific ST wave abnormality."  The SPECT test also revealed that 18% of Plaintiff's heart muscle was damaged—12% of that damage was considered "reversible," while 6% was "fixed" or permanent.  (AR 222, 421.)

On May 2, 2014, Plaintiff underwent a cardiac catheterization and coronary angiography.  (AR 292-93.)  The angiography was partially unsuccessful because one of the bypass grafts "could not be engaged directly."  Plaintiff's LIMA and Radial grafts did not show any new obstructions.  (AR 293.)

On May 14, 2014, Plaintiff visited Dr. Kedan, who noted that Plaintiff's symptoms "persist and seem to be exertional," but continued to have "nonspecific symptoms in the setting of known coronary artery disease and an ischemic cardiomyopathy" and was "not improving since the first year post CABG."  Dr. Kedan

8.

also noted that Plaintiff "has occasional chest pain with walking" and suffers shortness of breath a few times a day." However, Plaintiff told Dr. Kedan that he "is more confident that he can start exercising again." Due to the unsuccessful angiography on May 2, Dr. Kedan scheduled a CT coronary angiogram. (AR 241, 430.)

On June 9, 2014, Plaintiff underwent a cardiac CT and Thoracic Aorta Angiogram. The tests showed "no significant narrowing" in two of Plaintiff's three bypass grafts, but observed "calcified plaque with 100% occlusion in his RIMA to OM1 bypass graft." Plaintiff's attending physicians also noted that Plaintiff had significant native double vessel coronary artery disease. (AR 231.)

**D. Plaintiff's Initial LTD Claim**

On July 14, 2014, Plaintiff filed a claim for LTD benefits. (AR 506.) Plaintiff stated that he was unable to work due to chest pain, shortness of breath, dizziness, physical weakness, and anxiety. (AR 395.) He also indicated that he occasionally needed help with day-to-day activities. (AR 396-97.)

Plaintiff submitted an Attending Physician Statement ("APS") from Dr. Kedan, dated July 16, 2014. In the APS, Dr. Kedan diagnosed Plaintiff with cardiomyopathy and stated that he suffered from dizziness, heaviness in his chest, and pain in his left shoulder blade. Dr. Kedan indicated that he advised Plaintiff to stop working on November 18, 2013. (AR 404.) Additionally, Dr. Kedan stated that Plaintiff could sit continuously for six hours, stand and walk intermittently for one hour every day with no breaks. Plaintiff was also listed as being "at maximum medical improvement." (AR 405.) Although Dr. Kedan also advised Plaintiff that he could eventually return to work, Dr. Kedan listed Plaintiff's return to work date as "unknown." (AR 406.)

On August 25, 2014, Cheryl Henrichsen, MetLife's nurse consultant, and Dr. David Peters, MetLife's Medical Director, reviewed Plaintiff's medical records. (AR 555-57.) MetLife's review noted that the SPECT was "abnormal," but the angiogram revealed good revascularization. It also noted that Plaintiff's EF had improved from 35% to 50-53% and that there did "not appear to be clinical signs of [congestive heart

failure].” (AR 555-56.)  Based on this analysis, Dr. Peters opined that Plaintiff should be capable of sedentary work.  (AR 556.)

On September 11, 2014, Nicole Butler, MetLife's claims specialist, determined that there was "insufficient evidence to support disability" and recommended that MetLife deny Plaintiff's claim.  (AR 578.)  Butler drafted and referred Plaintiff's denial to her unit manager for review later that day.  (AR 582.)

On September 18, 2014, MetLife completed a vocational analysis using only the DOT's description of the "news editor" occupation.  (AR 588-89.)  That same day, MetLife advised Plaintiff of its denial of his claim.  (AR 373, 594.)

**E.  Plaintiff's Subsequent Medical History**

On August 7, 2014, Plaintiff met with Dr. Kedan who noted that Plaintiff continued to exhibit symptoms of heart disease.  Dr. Kedan also stated that Plaintiff's angiographic studies "suggest that the patient has severe and progressed coronary artery disease." (AR 246-47.)

On September 24, 2014, Dr. Kedan called and asked MetLife "what was needed" to assist Plaintiff's disability claim.  (AR 597.)  Dr. Kedan stated that "just because [Plaintiff] has an EF of 50% does not mean he does not have cardiac disease."  Butler acknowledged that Plaintiff has cardiac disease, but argued that Plaintiff's EF does not prevent him from taking a sedentary job.  (AR 598.)

On September 29, 2014, Plaintiff had another echocardiogram.  The test showed "mild to moderate left ventricular dysfunction" and an EF of 40%.  Dr. Kedan also observed "anterior and anteroseptal hypokinesis" and "diastolic septal bounce" in the left ventricle.  Plaintiff also displayed left ventricle enlargement.  (AR 100.)

On January 26, 2015, Plaintiff visited Dr. Gallik, who reported that Plaintiff had left chest pressure while resting, lasting about four hours.  Plaintiff also reported chest discomfort when undertaking mild activity, such as walking short distances.  Dr. Gallik suggested that Plaintiff's symptoms may be the due to the "unrevascularized area" of his heart.  (AR 298.)

In a June 16, 2015 letter to MetLife, Plaintiff indicated that he will be receiving EECP therapy for his heart condition from June 22, 2015 to August 12, 2015 on Dr. Kedan's recommendation. (AR 72, 90.)

On December 16, 2016, Dr. Kedan wrote a letter to the SSA summarizing Plaintiff's medical condition on Plaintiff's behalf. ("Kedan Letter to SSA," Dkt. No. 42-1, Ex. A.) Dr. Kedan stated that Plaintiff's heart damage made him unfit for physical labor. He also stated that Plaintiff was "not a good candidate for other sedentary jobs" because Plaintiff suffered from chest pains "while seated and while exerting himself." For instance, Plaintiff could only type for short periods of time before he needed to rest. As a result, Dr. Kedan concluded that Plaintiff was unable to resume any type of gainful employment and "will continue to see a decline in his physical and mental capabilities over time." (Kedan Letter to SSA at 2.)

### F. Plaintiff's Appeal of MetLife's Denial

On April 16, 2015, Plaintiff appealed MetLife's determination. (AR 340.)

MetLife referred Plaintiff's appeal to Dr. Sassower, an independent physician consultant board certified in cardiology. (AR 172.) On May 20, 2015, Dr. Sassower had a phone conversation with Dr. Kedan. According to Dr. Sassower, Dr. Kedan noted that Plaintiff had "diffuse disease' and could be suffering from angina." Dr. Kedan allegedly stated that "he could not see why [Plaintiff] could not work a desk job." (AR 199.) Dr. Kedan also did not present Dr. Sassower with any "evidence that [Plaintiff's] heart condition was impairing his reaction time or ability to concentrate." (AR 200.)

In his May 27, 2015 report, Dr. Sassower noted that Plaintiff suffered from "single vessel disease . . . with a preserved ejection fraction." Dr. Sassower concluded that Plaintiff would be somewhat restricted from physical labor, but those restrictions could be eliminated with therapy. (AR 200.) He also claimed that Plaintiff's cardiologist "attributed [Plaintiff's] symptoms to his stress and anxiety." Dr. Sassower questioned the accuracy of Plaintiff's nuclear imaging results "based on the results of the catheterization and CTA," which did "not correlate" with Plaintiff's SPECT results.

Specifically, Dr. Sassower noted that the SPECT test "raised a possibility that a different territory was at risk, which as per the catheterization report, it was not." Dr. Sassower also implied that Plaintiff's condition was not so serious because Plaintiff was taking "only a beta blocker as the sum total of his angina regimen" and that "[t]here were plans to consider EECP therapy but one might expect the use of a calcium channel blocker, long acting nitrate, or Ranexa as combination therapy." Finally, Dr. Sassower reported that Plaintiff's EF of 40% "in and of itself, in the absence of other stigmata of congestive heart failure would not and has not prohibited patients from returning to work." (AR 199-200.)

MetLife sent Dr. Sassower's report to Plaintiff's treating physicians for review and comment. (AR 160-66, 189-95, 196-202.) Dr. Kedan did not respond.

On May 31, 2015, Dr. Austin replied by letter and stated that he had "only been involved with [Plaintiff's] care from the standpoint of treating his anxiety and depression." Dr. Austin noted that he took over Plaintiff's psychiatric care after Plaintiff's previous psychiatrist closed his practice. Although Plaintiff's psychiatric medication have side effects such as fatigue and loss of concentration, Dr. Austin concluded that Plaintiff's medications "on balance have benefitted him with regards to the more debilitating underlying conditions." (AR 159.)

On June 4, 2015, Dr. Gallik replied by letter and stated that "[d]espite the CABG (coronary artery bypass graft), [Plaintiff] has significant residual scar and ischemia." Dr. Gallik reported that one of Plaintiff's bypass grafts was occluded, 18% of his heart muscle was damaged, and his EF was around 40%. Dr. Gallik concluded that Plaintiff is unable to perform "any physical or mentally stressful work, as it precipitates angina. Despite revascularization, [Plaintiff] remains with significant impairment of left ventricular function and ischemia." (AR 153.)

After reviewing Dr. Austin and Dr. Gallik's replies, Dr. Sassower provided a supplemental report dated July 7, 2015. Dr. Sassower stated that the reply letters did not change his previous opinion, stating that "Dr. Austin's explanation of his management

12.

of [Plaintiff's] psychiatric issues does not affect this opinion.  In addition, Dr. Gallik's confirmation of [Plaintiff's] ejection fraction is known to be mild to moderately reduced."  Dr. Sassower noted that no doctor made any comment regarding Plaintiff's antianginal regimen, but acknowledged Plaintiff's June 16, 2015 letter to MetLife stating that Plaintiff would be starting EECP therapy.  Dr. Sassower also noted that no doctor commented about Plaintiff's exercise capacity.  (AR 77, 79.)

On July 10, 2015, MetLife notified Plaintiff that it was upholding its prior denial of LTD benefits.  (AR 67.)

## V.    DISCUSSION AND CONCLUSIONS OF LAW[5]

### A. Medical Evidence

On *de novo* review, the court must resolve conflicting evidence and find facts. The Ninth Circuit has recognized that "a true medical diagnosis does not by itself establish disability."  *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004).  Rather, a claimant must prove than his impairment is disabling, using objective and subjective medical evidence in the record.  *Seleine v. Flour Corp. Long-Term Disability Plan*, 598 F. Supp. 2d 1090, 1101-02 (C.D. Cal. 2009).  As in this case, a claimant's treating physician and the plan's hired medical expert often provide conflicting opinions and courts must determine which opinion to credit.  ERISA does not provide district courts with guidance for resolving such conflicts.

However, it is well understood that ERISA does not require a plan administrator to accord greater weight to a claimant's treating physician.  *See, e.g.*, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 834 (2003) ("[I]f a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled . . .' [therefore] courts have no warrant to require administrators automatically to accord special weight to the opinions of a

---

[5]  Any finding of fact which is deemed a conclusion of law is incorporated herein by reference.

claimant's physician"). Otherwise, the cases yield some common-sense guidance for assessing conflicting medical opinion evidence. In *Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114 (C.D. Cal. 2012), the Court succinctly stated them as follows: the "credibility of physicians' opinions turns only on whether they report subjective complaints or objective medical evidence of disability, but on (1) the extent of the patient's treatment history, (2) the doctor's specialization or lack thereof, and (3) how much detail the doctor provides supporting his or her conclusions." *Shaw*, 144 F. Supp. 3d at 1129.

Here, the administrative record contains the reports of Plaintiff's treating physicians, as well as those of MetLife's IPC, Dr. Sassower, and a brief opinion by MetLife's Medical Director, Dr. Peters. Plaintiff's heart condition and symptoms are not generally in dispute. Rather, the parties' dispute whether Plaintiff's heart condition is sufficiently severe to prevent him working in his usual occupation.

MetLife's based its initial decision to deny Plaintiff LTD benefits on Dr. Peters's medical opinion. Dr. Peters states that "[t]here do not appear to be clinical signs of [cardiac heart failure] . . . " in light of Plaintiff's coronary angiogram showing "good revascularization" and Plaintiff's EF improving from 35% to 50-53%. (AR 555-56.) It is unclear whether Dr. Peters was referencing Plaintiff's May 2, 2014 or June 9, 2014 angiogram. Both procedures, however, do not support his analysis. Plaintiff's May 2, 2014 angiography was inconclusive—the procedure showed good revascularization in two of Plaintiff's three bypass grafts, but the third graft was "poorly visualized" and "could not be engaged directly." (AR 293.) Like his previous angiogram, Plaintiff's June 9, 2014 angiogram revealed no problems with his LIMA and Radial grafts. However, the June 9, 2014 angiogram also revealed that Plaintiff's RIMA graft was 100% occluded. (AR 231.) In addition, Plaintiff's EF dropped to 40% in the months following MetLife's denial of his initial claim. (AR 100.) Accordingly, the Court does not find Dr. Peters's opinions persuasive and accords it little weight.

Similarly, the Court finds Dr. Austin's medical opinions to be of little assistance.

14.

In his May 31, 2015 letter, Dr. Austin made clear that he was only involved with Plaintiff's care "from the standpoint of treating his anxiety and depression" and offered no opinion with regards to Plaintiff's heart condition. Dr. Austin stated that although Plaintiff's anti-anxiety and anti-depressant medications had some side effects, they "on balance" had benefitted Plaintiff. (AR 159.) Given that the gravamen of Plaintiff's claim is that he was disabled due to his heart condition, not his anxiety or depression (*see* AR 329), the Court also accords little weight to Dr. Austin's opinions.

On the other hand, the medical opinions of doctors Kedan, Gallik, and Sassower are directly on point. The three doctors all specialize in heart-related medical fields and each doctor provided a thorough review of the medical records. Dr. Sassower, MetLife's IPC, opined that Plaintiff was not disabled, while Dr. Gallik, Plaintiff's cardiac electrophysiologist, stated that Plaintiff could not do physically and mentally stressful work. The parties dispute whether Dr. Kedan supported a finding that Plaintiff was totally disabled from his usual occupation—MetLife maintains that Dr. Kedan "could not see why [Plaintiff] could not work a desk job" (AR 199), while Plaintiff argues that Dr. Kedan also believed that he was disabled.

Ultimately, the Court finds that Dr. Sassower's opinion is not persuasive. Dr. Sassower only conducted a paper review of Plaintiff's medical records and never examined Plaintiff in person. Although MetLife is not required to ask its physicians to conduct an in-person examination, the Ninth Circuit has viewed "pure paper" reviews with some skepticism. *See Montour*, 588 F.3d at 634 (a "pure paper" review "raise[s] questions about the thoroughness and accuracy of the benefits determination"); *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676-77 (9th Cir. 2011) (criticizing administrator's decision to not conduct an in-person examination when every physician that did so found that claimant was disabled).

Moreover, Dr. Sassower's report has several critical issues. First, Dr. Sassower stated that Plaintiff suffered from "single vessel disease." (AR 200.) Plaintiff, however, was diagnosed with a double vessel coronary artery disease. (AR 231.) Dr. Sassower

cites no evidence supporting his diagnosis of "single vessel disease."

Second, Dr. Sassower selectively interpreted the results of Plaintiff's catheterization reports. Dr. Sassower relied on those reports to question the accuracy of Plaintiff's SPECT test results, but ignored them when he argued that Plaintiff's EF of 40% was not sufficient to demonstrate disability "in the absence of other stigmata of congestive heart failure." Dr. Sassower offers no explanation why the complete occlusion of Plaintiff's RIMA graft did not constitute "other stigmata of congestive heart failure." (AR 200.)

Furthermore, Dr. Sassower is alone in criticizing Plaintiff's medical regimen as being "underrepresented by certain classes of medications." (AR 201.) Dr. Kedan, for example, stated that Plaintiff was "on an optimal medication regimen." (AR 251.) When Plaintiff initially filed his claim, MetLife's nurse consultant and Dr. Peters also found that he was "on a good medication regimen." (AR 542.) In addition, Dr. Sassower notes that Plaintiff would be undergoing EECP therapy, but does not alter his analysis or explain why EECP therapy was insufficient to change his opinion. (*see* AR 77.) Given the litany of other medications Plaintiff was taking (*see* AR 441), it is not clear from the record that Plaintiff's medical regimen was lacking.

Similarly, Dr. Sassower argues that Plaintiff's SPECT test results may have been a "false positive" because it did not correlate with his angiograms. (AR 199.) However, Dr. Sassower does not explain why the lack of correlation implies that the SPECT test is inaccurate—it is not clear that the results of the SPECT test and the angiograms are mutually exclusive. Rather, the two tests simply revealed different problems with different areas of Plaintiff's heart. As Dr. Gallik explains, "[d]espite revascularization, [Plaintiff] remains with significant impairment of *left* ventricular function" as shown on his SPECT, and his "*right* internal mammary graft" was occluded as per his angiogram. (AR 153 (emphasis added).) Moreover, Dr. Sassower does not fully address Dr. Gallik's other interpretations regarding Plaintiff's test results—he only notes Dr. Gallik's comment regarding Plaintiff's EF. (*see* AR 79.)

In contrast, Dr. Gallik and Dr. Kedan repeatedly note in their medical records that Plaintiff suffers from chest pains and shortness of breath even while at rest. On March 3, 2014, for example, Dr. Gallik reported that Plaintiff suffered from "chest discomfort" after walking only half a block and shortness of breath even when sitting. (AR 304.) Similarly, on May 14, 2014, Dr. Kedan noted that Plaintiff had chest pains while walking, as well as lightheadedness and shortness of breath. (AR 242.) In his letter to the SSA, Dr. Kedan further stated that Plaintiff has chest pains while seated and suffers from shortness of breath while typing. (Kedan Letter to SSA at 2.)

Finally, the Court finds that Dr. Kedan's alleged statement that he "could not see why [Plaintiff] could not work a desk job" does not support MetLife's denial. (AR 199.) First, there is reason to doubt the veracity of this hearsay statement. Dr. Kedan never corroborated Dr. Sassower's account of their conversation. The statement is also inconsistent with Dr. Kedan's position throughout the claims process. Dr. Kedan had recommended Plaintiff to stop working after unsuccessfully attempting to return to work. (*See* AR 404, 409.) Although Dr. Kedan had advised Plaintiff that he could return to work, Dr. Kedan stated he was uncertain when that would be possible. (AR 406, 410.) Dr. Kedan also called MetLife on September 24, 2014 to ask "what was needed" to help Plaintiff succeed on his claim. (AR 597-98.) Furthermore, in his December 19, 2016 letter to the SSA, Dr. Kedan stated that Plaintiff was disabled and unable to perform any occupation due to his heart condition. (*See* Kedan Letter to SSA, Dkt. No. 42-1 at 2.)

Even if the Court assumes, *arguendo*, that Dr. Kedan did tell Dr. Sassower that Plaintiff could work a desk job, that statement is not particularly helpful. Under the terms of the Plan, Plaintiff is entitled to LTD benefits for an initial 24-month period if he is unable to perform his "Usual Occupation." An ability to perform a "desk job" does not necessarily translate to an ability to work as an assistant news editor.

In sum, the Court finds that Plaintiff submitted reliable evidence that he suffers from a significant heart condition. Plaintiff is unable to work at a physically and

1    mentally stressful occupation.

2    **B. Plaintiff's Usual Occupation and Substantial and Material Duties**

3    An insurer must conduct its vocational analysis "in a reasoned and deliberative

4    fashion." *Salz v. Std. Ins. Co.*, 380 Fed. Appx. 723, 724 (9th Cir. 2010). When a LTD

5    plan conditions LTD benefits to a claimant's inability to do his "usual" or "regular"

6    occupation, the insurer must analyze "what the claimant actually does before it

7    determines what the 'Material Duties' of a claimant's occupation are." *Ibid.* The DOT

8    has been "recognized as a widely used and reasonable reference for administrators and

9    courts to use under ERISA" in order to conduct a vocational analysis. *Ramos v. United*

10   *of Omaha Life Ins. Co.*, 2013 U.S. Dist. LEXIS 114373 at *15 (N.D. Cal. Aug. 13,

11   2013). However, federal courts have routinely criticized the blind acceptance of the

12   DOT's descriptions. *See Salz*, 380 Fed. Appx. at 724 (insurer's "exclusive reliance" on

13   the DOT was unreasonable); *Lasser v. Reliance Std. Life Ins. Co.*, 344 F.3d 381, 387 n.5

14   (3rd Cir. 2003) (DOT's silence on the "critical issue" of a surgeon's on-call and

15   emergency duties make reliance on DOT unreasonable); *but see Gallagher v. Reliance*

16   *Std. Life Ins. Co.*, 305 F.3d 264, 272-73 (4th Cir. 2002) (reliance on DOT was

17   reasonable when the DOT only omitted a minor occupational duty).

18   At the outset, MetLife's handling of Plaintiff's claim with respect to its vocational

19   analysis invites skepticism. According to the claim activity log in the Administrative

20   Record, MetLife's claim specialist drafted and submitted her recommendation for denial

21   on September 11, 2014. (AR 582.) However, MetLife did not complete a vocational

22   analysis until September 18, 2014. (AR 588-89.) MetLife then issued a denial of

23   Plaintiff's claim later that same day. (AR 594.) This awkward timeline suggests that

24   MetLife's may have failed to consider *any* vocational analysis in making its decision to

25   deny Plaintiff's LTD benefits and therefore falls short of the "reasoned and deliberative

26   fashion" required under ERISA. *Salz*, 380 Fed. Appx. at 724.

27   More problematic, however, is the fact that MetLife's vocational analysis consists

28   solely of a verbatim reproduction of the DOT's description of "news editor." (*See* AR

588-89.)  While reference to the DOT is generally reasonable, the DOT's description as it relates to this case is outdated.  The DOT's entry for "news editor" refers only to duties relevant for print media, such as "plan[ning] layout of newspaper edition," "receiv[ing] . . . dummy page layouts marked to indicate columns occupied by advertising," and "mark[ing] layout sheets to indicate position of each story."  (AR 588-89, *see also* Petti Decl., Ex. A, Dkt. No. 44-1 (noting that the DOT was last updated in 1977).)  These duties do not adequately reflect modern news media, where online reporting can be critical to a media outlet's success.  Indeed, Plaintiff's own description of his occupation revolves almost entirely around online media and supervising others.  Simply put, the "news editor" occupation described by the DOT is fundamentally different from Plaintiff's "news editor" occupation.  The DOT's description is inapplicable here.  MetLife's failure to consider what Plaintiff "actually does before it determines what the 'Material Duties' of a claimant's occupation are" was error.  *Salz*, 380 Fed. Appx. at 724.

Additionally, MetLife's analysis only addressed the physical requirements of the job and failed to consider the mental requirements.  Plaintiff noted that "deadline pressure was constant" as his employer strived to publish stories "within minutes of breaking news."  (AR 329.)  Plaintiff's employer also provided a limited job description, stating that Plaintiff's occupation contained an "occasional" amount of stress.  (AR 449.)

MetLife argues that the high levels of stress and deadline pressure cited by Plaintiff was peculiar to working at a corporate stock market publication.  Under the terms of the Plan, such peculiarities are not considered part of Plaintiff's "Substantial and Material Acts" associated with Plaintiff's "Usual Occupation."  This argument has some merit, but is ultimately unavailing.  While the particularly high levels of stress cited by Plaintiff may indeed be unique to a corporate stock market publication, the record is devoid of any inquiry into the basic functions of the modern news editor.  MetLife has no basis to conclude that Plaintiff and his employer's descriptions are

inaccurate or that Plaintiff's actual occupation is particularly unique. *Cf. Lasser*, 344 F.3d at 387-88 (insurer analyzed survey responses to determine what duties are material to being an orthopedic surgeon generally). Moreover, Plaintiff and his employer's description of work-related stress appears reasonable in light of the modern 24-hour news cycle.

Thus, the Court credits Plaintiff and his employer's description of his occupation over the DOT's description. (*See* AR 329, 449.) Plaintiff's "Usual Occupation" was that of an assistant news editor. His job was sedentary and required him to sit for seven to eight hours a day with the repetitive use of his hands. He was required to update and edit online news articles and supervise others. Plaintiff's occupation involved no physical labor, but it was occasionally mentally stressful because of deadline pressure. Though Plaintiff's precise duties and levels of stress do not define his "usual occupation," they adequately illustrate the duties of an assistant news editor at an online publication.

Here, Plaintiff has submitted sufficient evidence that he is disabled from his "Usual Occupation." Dr. Kedan and Dr. Gallik both found that Plaintiff is unable to work at a mentally stressful job. (*see* AR 153; Kedan Letter to SSA.) In addition, Plaintiff had previously attempted to go back to work—first on a part-time basis, before transitioning into full-time. (AR 444.) Less than five months later, Plaintiff had to go back on medical leave. (AR 329.) Taken together, the Court finds that Plaintiff is unable to work as an assistant news editor and is therefore "totally disabled" from his "Usual Occupation."

Accordingly, the Court finds that MetLife did not perform a reasoned and deliberative vocational analysis regarding the tasks that Plaintiff performed before determining the material duties of his job. Metlife's reliance on its IPC's opinion over that of Plaintiff's physicians was unreasonable in this case. Therefore, the Court concludes that MetLife's determination that Plaintiff was not totally disabled from his usual occupation was incorrect under this record. Rather, Plaintiff has established that

he is totally disabled under the terms of the Plan and MetLife incorrectly denied him LTD benefits.

### C. Disability Under the "Any Occupation" Clause of the Plan

The Plan provides benefits in two stages, reviewed under different definitions. Benefits for the first 24 months after the Elimination Period are reviewed under the "Usual Occupation" definition, while benefits past the initial benefits period are reviewed under the "any occupation" definition. (AR 25.) Because MetLife denied Plaintiff's claim under the "Usual Occupation" definition of disability, it did not evaluate whether Plaintiff was disabled under the "any occupation" definition. The claim administrator must make determinations of entitlement to benefits under ERISA in the first instance. *Taft v. Equitable Life Assurance Soc'y of the U.S.*, 9 F.3d 1469, 1472 (9th Cir. 1993); *see also Saffle v. Sierra Pacific Power Co. Bargaining Unit LTD Income Plan*, 85 F.3d 455, 460 (9th Cir. 1996).

Thus, the Court remands the case back to MetLife to assess whether Plaintiff is disabled under the "Any Occupation" definition of disability.

### VI.   CONCLUSION

For the foregoing reasons, the Court finds in favor of Plaintiff Kenneth Popovich and against Defendant MetLife. The Court

(1) **DECLARES** that MetLife violated the terms of the Plan by denying Plaintiff's claim for long term disability benefits;

(2) **ORDERS** MetLife and the Plan to pay Plaintiff's long term disability benefits owed under the terms of the Plan from February 16, 2014, through to February 16, 2016, together with prejudgment interest on each and every such payment through to February 16, 2016; and

(3) **REMANDS** to MetLife to determine whether Plaintiff met the Plan's definition of disability under the "any occupation" provision.

The parties are **ORDERED** to meet and confer on any remaining issues, including Plaintiff's attorneys' fees. If the parties can agree on the remaining issues,

1  Plaintiff must submit a Proposed Judgment within twenty-one (21) days of this order.

2      If the parties require court intervention to resolve any remaining issues, the parties

3  shall submit a Join Report within twenty-one (21) days of the issuance of this order,

4  explaining the nature of their remaining disputes and proposing an appropriate schedule

5  for resolving them.

6      **IT IS SO ORDERED.**

7  Dated:  December 21, 2017      _____

8                                 HONORABLE ANDRÉ BIROTTE JR.
                                   UNITED STATES DISTRICT COURT JUDGE